**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**BRYSON CITY DIVISION**
**CIVIL CASE NO. 2:09cv031**

| | | |
|---|---|---|
| **LEA ANNE RHYNE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 8] and the Defendant's Motion for Summary

Judgment [Doc. 11].

**I.    PROCEDURAL HISTORY**

The Plaintiff Lea Anne Rhyne filed an application for a period of

disability and disability insurance benefits, as well as supplemental security

income on November 13, 2007, alleging that she had become disabled as

of March 31, 2007.  [Transcript ("T.") 108].  The Plaintiff's application was

denied initially and on reconsideration.  [T. 64-71, 72-78].  A hearing was

held before Administrative Law Judge ("ALJ") George J. Spidel on October

20, 2008.  [T. 22-59].  On December 10, 2008, the ALJ issued a decision denying the Plaintiff benefits.  [T. 10-21].  The Appeals Council accepted additional evidence, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  [T. 1-4]. The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, *see* Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).  The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established.  It means

2

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.   THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no

severe impairment is shown and the claimant is not disabled.  Id.  Third, if

the impairment meets or equals one of the listed impairments of Appendix

1, Subpart P, Regulation 4, the claimant is disabled regardless of age,

education or work experience.  Id.  Fourth, if the impairment does not meet

the criteria above but is still a severe impairment, then the ALJ reviews the

claimant's residual functional capacity (RFC) and the physical and mental

demands of work done in the past.  If the claimant can still perform that

work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant

has a severe impairment but cannot perform past relevant work, then the

ALJ will consider whether the applicant's residual functional capacity, age,

education, and past work experience enable the performance of other

work.  If so, then the claimant is not disabled.  Id.  In this case, the ALJ's

determination was made at the fifth step.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was born on February 6, 1959 and was 49 years old at

the time of the ALJ's hearing.  [T. 108, 22].  The Plaintiff completed the

twelfth grade.  [T. 141].  Her past relevant work includes several years

managing a convenience store, where she stocked, ordered supplies, did

customer service, personnel management, accounting and cash register

work; as well as cashier, clerical, and spot weld cleaner work. [T. 138].

According to her application materials, the exertional demands of her

different jobs varied; the heaviest weight she lifted among her jobs was 20

pounds, and 10 pounds frequently. [T. 150].

At the time of her application, Plaintiff was 5'2" tall and weighed 274

pounds. [T. 136]. At the time of the hearing, she had maintained a

constant weight for about a year. [T. 43]. She alleged she was disabled by

obesity, diabetes, arthritis in her hands, shoulders, and knees; shortness of

breath, memory problems, scoliosis, high blood pressure, stomach ulcers,

back pain and weakness, and hip pain. [T. 137]. She last worked March

12, 2007. Id.

Plaintiff denied any mental or emotional problems in her application.

[T. 139]. She does not see a psychiatrist and has no trouble getting along

with people. [T. 152]. She has memory problems; she cannot remember

"a couple years from her 20s", remembers faces but not names, and uses

lists at the grocery store. [T. 152].

She has to have help with aspects of dressing and with navigating

stairs. When ministering, Plaintiff sits to sing. Shortness of breath limits

her activity. She has pain in her hands, arms, shoulders, hips, back and

knees. Getting in and out of the tub hurts her knees. She cries from the

stress of inability to keep up with the chores. [T. 168]. Plaintiff cannot clean the bathroom. Her back and knees will not hold her up for long. [T. 156]. She has chest pain that radiates to her teeth and left side. [T. 166]. At the time of her application, she was taking extra strength Tylenol for pain, with little effect, and metphormine for diabetes. [T. 167].

A letter from Plaintiff, received by Defendant on September 17, 2008, indicates that she was additionally suffering with chest, neck and jaw pain and occasional dizziness. Pain from arthritis was all over her body. Laying or sitting for over 30 minutes caused pain in her lower back and hips. "It takes a good 10 minutes for [me] to walk straight." As a guitar player and singer, she was reduced by aching pain to two songs. She had recently visited the emergency room with a stiff neck. She indicated that xrays showed the arthritis. The pain was, at this time, much better. The letter related that her scoliosis was discovered after a car accident in the 1980s, and she was told she should never lift over 5 pounds, but no records of that exist. Pain and shortness of breath make it difficult for her to cook, clean and keep up with her husband's two children. Hindered breathing reduces her energy. Dizziness comes intermittently, gone for months and then present for up to a week. [T. 171].

A letter to ALJ Spidel from Plaintiff dated October 3, 2008 related that she sometimes has to nap during the day because of problems with sleep at night, has little energy, and was having burning in her leg intermittently after falling two weeks before then. They had additional stress at home due to family illness. [T. 172].

Plaintiff testified that she and her husband are a full-time ministry that provides preaching and singing on call; they have done this together since marrying in July 2006 [T. 36, 38, 39]. She described the physical duties of several jobs. [T. 40-42]. Pain in her joints is her worst problem; diabetes is more manageable. [T. 43]. She receives no treatment for her joint pain. [T. 44]. She is not insulin dependent, does not test her sugars because of the expense, and the only prescription medication she was taking as of the time of the hearing was Metformin. [T. 43-4]. The only side effect from it is diarrhea. [T. 47].

Plaintiff stopped working because pain increased to the point where "you're either going to do the work for the family and keep up your family, or you're going to be able to work outside the family, you can't do both anymore." Because her husband's ex-wife had cancer, his children, ages 11 and 10, spent much time with Plaintiff. [T. 46, 48].

Plaintiff was sent for a consultative psychological evaluation because of her memory problems. She forgets everyday things like medicine and her wallet. The examiner told her that when "there's so much going on, it happens a lot that people forget things." [T. 46]. The ALJ reminded her that emotional problems upon her move to North Carolina were also a trigger for the evaluation. [T. 46-7]. She used to cry a lot from those issues, but not as much now. [T. 47].

Plaintiff's standing is limited to 10 minutes by pain in her hips and back. Walking is better; she can walk 20 minutes at the grocery store, supported by the cart. [T. 47]. On the Sunday before the hearing, she worked at church from 11 to 3:30, for two services, and rested the rest of the day.

In Wisconsin, Plaintiff was being treated for diabetes and knee pain. She was sent for a MRI, but it was not completed. [T. 50]. No xrays were made of her knees, but a chest xray was taken in relation to her breathing problems. [T. 51]. She was seen by Dr. Rebecca Conway there from 2004 to 2006. [T. 53].

Her husband testified. He said she was able to work for the Lord and sing. She helps him, takes care of him and his kids, and is not able to hold down a full time job. [T. 55].

Mark Leaptrot was credentialed as an expert witness and testified as a vocational expert. He classified Plaintiff's several past jobs as follows: general office worker, light, semiskilled, with an SVP of 3; convenience store manager, light, skilled, with an SVP of 7; production buffer and acid cleaner, medium, unskilled, with an SVP of 2; cashier, light, unskilled, with an SVP of 2. [T. 58]. He opined that this background produced no skills transferable to straight sedentary work, but some of the bookkeeping skills would transfer to receptionist positions which is sedentary and unskilled. [T. 59].

On February 13, 2008, Plaintiff was evaluated for the State Agency by Dr. Amy Rehfield. [T. 189-193]. Her chief complaint was scoliosis with low back pain and pain in the hips, knees, left elbow and hand with hand numbness. [T. 189]. She reported having 15 years of chiropractic treatment but never any MRI or recommendation for surgery, physical therapy, or epidural injections. The recent year's chiropractic treatment helped. [T. 189]. She reported injury to her right knee three years ago. She did not have it evaluated; similarly, she did not have hand or elbow pain evaluated. Plaintiff said that her sugars run in the mid-100s, but that she does not do any home testing. [T. 190]. She reported that peptic ulcer

disease was diagnosed 20 years ago and makes her unable to take aspirin or NSAIDs. Her weight was reported as 284.

Plaintiff walked with a normal gait and without assistive devices. [T. 190]. She appeared comfortable, and her intellectual functioning seemed normal. Her hearing and memory were good. She was easily fatigued [T. 194] and showed shortness of breath with effort, but not with lying down, and no chest tenderness was noted. No heart murmur was observed, but Plaintiff reported that one had been diagnosed in high school. Her weight was characterized as morbidly obese. Range of motion was full except at the wrists. The right wrist had undergone carpal tunnel repair. All other hand tests were normal. [T. 191]. Both knees had some edema and tenderness, but no redness, warmth, laxity or crepitus. The ligaments were intact and stable. Range of motion was normal. The cervical spine showed no tenderness or muscle spasm.

Examination of the dorsolumbar spine, limited by obesity, showed no scoliosis. There was muscle tenderness but no spasm in the lumbar area. The straight leg raising test was normal. There was no hip joint tenderness, redness, warmth, swelling or crepitus. There was no atrophy by measurement of her upper and lower extremity circumferences. Plaintiff could heel-toe walk, perform tandem gait, and squat with difficulty. [T.

192].   Grasping objects with the left hand was mildly impaired.  Most

activities were mildly impaired by morbid obesity; otherwise, squatting and

carrying are not particularly impaired.  [T. 193].

Plaintiff underwent psychological evaluation on March 20, 2008 with

Elizabeth Tulou, MA for the State Agency.  She was adequately groomed,

cooperative and had no difficulty answering questions.  She displayed no

physical problems.  She reported a very neglectful relationship, and the

aging and deaths of her parents, in the 1980s.  She was missing family and

friends in Wisconsin, but her husband would not let her go there.  [T. 166].

She did not realize how complicated her marriage would be until she

moved here, which increased her depression and anxiety, on rare

occasions to the point of panic attacks.  She reported having three

stepchildren, which differs from other reports of having two, and was noted

as "claim[ing]" to have one sister.  She reported pain and forgetting to do

monthly reports at work as the reasons she ceased working.

Plaintiff has no problems being in public, and can shop, go to

ballgames, and minister as needed.  [T. 197]. She discussed problems

realistically, remained alert and responsive, and had organized, coherent

thoughts.  Her memory was good except for inability to recall childhood

birthdays.  Her judgment was marginal, and her intelligence average.  [T.

198].  Results of her WMS-III memory testing were:  Working memory, average; ability to learn and remember new material, superior; and auditory learning, high average.  [T. 201].  The diagnostic impression was adjustment disorder with mixed anxiety and depressed mood, and panic disorder without agoraphobia.  She takes no psychotropic medications, and any memory problems were deemed situational.  She performed simple, routine tasks and maintained concentration and persistence normally.  She enjoys others and has no history of relational problems.  [T. 202].

A physical residual functional capacity assessment was completed on March 25, 2008.  [T. 204-211].  Mild limitations due to obesity and exertional limitations to 25 pounds frequent lifting, 6 hours standing/walking, and 6 hours sitting were established.  Followup physical RFC assessments on May 2, 2008 and June 5, 2008 established identical limitations to those, and concluded with a medium RFC level  [T. 227-234, 235-242].

A psychiatric review technique form was completed  for Plaintiff on March 27, 2008.  [T. 212-225].  Affective disorders and anxiety-related disorders were evaluated.  They were found not to be severe, and to present no limitations whatsoever under the "B" criteria.  A followup PRTF dated June 16, 2008 again showed no severity to the impairments, but mild

limitations in ADLs, social functioning, concentration, persistence and pace. She alleged no worsening of her memory problem, and the evaluator noted that her allegations were not supported by the exam findings. [T. 243-255].

A cervical spine x-ray taken at Murphy Medical Center on August 4, 2008 was read as normal. [T. 266].

Before moving to North Carolina, Plaintiff lived in Wisconsin. There, according to evidence newly submitted by Plaintiff to this Court on March 24, 2010, she underwent a PA & Lateral Chest xray evaluating for pneumonia at Sacred Heart-Saint Mary's Hospital under the order of Dr. Rebecca Perry of Ministry Medical Group. The January 30, 2001 report of that xray noted "considerable scoliosis to the right". [Doc. 16-2].

After that xray, Plaintiff saw Dr. Perry on 17 occasions from March 6, 2002 to April 26, 2006. At her first visit, left knee pain was the chief issue. She was grossly overweight. The knee was slightly puffy but was stable, not having given way or sustained a fracture. [T. 295]. In 2004, she was expressing interest in gastric bypass surgery; 25 minutes was spent discussing weight management. [T. 293-4].

Dr. Perry diagnosed Plaintiff with diabetes on February 13, 2004 and started Glucophage. [T. 292]. During subsequent appointments, efforts to lose weight and get blood sugar under control were the focus, and the idea

of surgery was abandoned. [T. 283-292]. She had problems with her stress handling mechanisms. [T. 290]. She did not follow all weight loss recommendations, not attending Overeaters Anonymous in spite of repeated reminders. She did lose weight when she made the effort. [T. 283, 285, 287, 288, 289]. When she could afford to monitor her blood sugar, it stayed under control. [T. 279, 281]. She was switched to Metformin in 2006 after months of not having been to the doctor. [T. 279]. She was "still working on getting Community Care" to afford medical care as of March 15, 2006. [T. 278]. By the next month, she was noted as having been off her Metformin for several days, and preparing to move to North Carolina. [T. 277].

Chatuge Family Practice records show morbid obesity, hypertension, hyperlipidemia, and non-insulin-dependent diabetes mellitus were her major problems, and diet counseling was diagnosed. [T. 175]. On September 21, 2007, her weight was 282, up one pound from August 31, and her height, 5'1.5". [T. 176]. The constant dull abdominal pain she complained of during her August 31 visit was resolved. She was noted as obese, pleasant, and in no acute distress. Prevacid 15mg and aloe vera juice were prescribed. [T. 180-1].

## V.    THE ALJ'S DECISION

On December 10, 2008, the ALJ issued a decision denying the Plaintiff's claim.  [T. 13-21].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff had acquired sufficient quarters of coverage to remain insured through March 31, 2011, thus making that date her "date last insured" (DLI), and that she had not engaged in any substantial gainful activity since her alleged onset date of March 31, 2007.  [T. 15].  The ALJ then found that the medical evidence established diabetes and obesity as severe impairments.  [T. 15].  He then found that the medical evidence established scoliosis, arthritis, depression and anxiety to be non-severe. [T. 18].  The ALJ then determined that none of Plaintiff's impairments met or equaled a listing.  [T. 18].  The ALJ assessed the Plaintiff's residual functional capacity, finding that she could perform the full range of sedentary work, specifically including the ability to lift five pounds frequently, ten pounds occasionally, sit six hours, stand/walk two hours, and occasionally bend, stoop and crouch.  [T. 19].  From these, he determined that Plaintiff could perform her past relevant work as a general office worker as she actually performed it, since that work does not require the performance of activities precluded by her RFC.  [T. 20].  Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined by the

Social Security Act from the alleged onset date of March 31, 2007.  [T. 21].


## VI.    DISCUSSION

Plaintiff's submissions suggest the following assignments of error: That the ALJ erred in (A) providing a technically deficient hearing, and failing to admit or consider evidence Plaintiff, acting *pro se*, proferred at hearing; (B) failing to develop the record and review all medical evidence; and (C) assessing medical source evidence and Plaintiff's credibility.

These will be addressed *seriatim*.

## A.    Plaintiff received a full and fair hearing.

Claimants in disability cases are entitled to a full and fair hearing of their claims, and the failure to have such a hearing may constitute good cause sufficient to remand to the Secretary under 42 U.S.C. s 405(g) for the taking of additional evidence. 20 C.F.R. 404.927 and 416.1441. While lack of representation by counsel is not by itself an indication that a hearing was not full and fair, it is settled that where the absence of counsel created clear prejudice or unfairness to the claimant, a remand is proper. Sims v. Harris, 631 F.2d 26, 27 (4th Cir.1980) (internal citations omitted).

It is equally settled that in *pro se* cases, Administrative Law Judges have a duty to assume a more active role in helping claimants develop the record. 631 F.2d at 28.

Plaintiff implies error in pointing out that the hearing was marked by some technical difficulties.  The ALJ did admit that having a hearing outside the hearing office, using a computer, was a new experience for him.  The technical difficulties were further strained by Plaintiff's not having an attorney or computer of her own.  [T. 24].   Some of the 50-minute hearing was occupied with the ALJ's manually demonstrating to Plaintiff the exhibits, which were noted as being few in number.  [T. 24-29].  Plaintiff demonstrated no confusion or objection about the process or the content. Where confusion arose, the ALJ quickly discovered and explained that another claimant's materials had become mingled with Plaintiff's.  The ALJ took the time to explain this and sort it out.  Plaintiff demonstrated no adversity from this glitch in a new process at the hearing or in her brief.  [T. 30].  The ALJ left no technical problem unresolved, so Plaintiff experienced no prejudice from the unavoidable problems with the hearing process.

Plaintiff appears to note error in the fact that the ALJ several times indicated that it was not her or her husband's turn to testify.  Those indications came in the midst of his experiencing technical difficulties and

his efforts to be sure the record was fully developed. Plaintiff's and her husband's substantive testimony fills 26 of the 37 pages of the 50-minute hearing's transcript. Plaintiff does not point to any testimonial evidence that she was prevented from offering. The record, including the hearing transcript, demonstrates that Plaintiff was amply notified of her right to counsel, and made an informed choice to waive that right. [T. 24]. The ALJ fulfilled his duty to provide a full and fair hearing. 631 F.2d at 27.

## B. The ALJ fulfilled his duties to develop the record and review evidence.

Plaintiff implies that the ALJ did not consider all of her medical evidence. While the ALJ does have the obligation to develop the record, Plaintiff has the burden of proof to provide evidence establishing disabling impairments. 42 U.S.C. s 423(d)(5); 20 C.F.R. s 404.1502 (1980); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). Hearing dialogue between the ALJ and Plaintiff revealed records that Plaintiff felt should have been in the record. The ALJ determined they were missing, and took information from Plaintiff in order to seek them. [T. 28-9, 51-4, 59]. The records Plaintiff mentioned, from Murphy Medical Center and from Dr. Rebecca Perry of Rhinelander Medical Group's Ministry Medical Group, subsequently became part of the record. The records from Dr. Perry are dated 2002-2006, a period well prior to Plaintiff's date of onset. Plaintiff obtained some records from Dr.

Perry on her own, as well, as mentioned in her February 18, 2009 letter to the Appeals Council, demonstrating that she is able to meet her burden of proof in providing medical records.  [T. 5].  The Regulations establish the ALJ's duty to make *reasonable* efforts to seek out Plaintiff's records, and the Court is satisfied that he did.  20 C.F.R. 404.1512(3)(emphasis added).

Reasonable efforts do not guarantee that every record will be found. In spite of the efforts of both the Defendant and the Plaintiff to develop the record, the ALJ did not have the next-described record when entering his decision, nor did the Court's administrative transcript for this review contain it until March 24, 2010 when, upon this Court's order for the parties to explain the status of two pages apparently missing from the administrative transcript [Doc. 13], Plaintiff submitted it.  That record is a radiology report by Dr. Harry Skye, interpreting a chest xray ordered by Dr. Perry and taken at Sacred Heart-Saint Mary's Hospitals on January 30, 2001.  [Doc. 16-2]. The actual radiographic images that it interprets are pages 296 and 297 of the administrative transcript, resubmitted also in response to the aforementioned order.  [Doc. 17].  It is apparent from the whole record that the radiographic images were before the Appeals Council via Plaintiff's submission of a CD-Rom and letter; the Council accepted the CD-Rom and letter into evidence as Exhibit AC-1.  [T. 4].  But it is not as clear to the

Court whether Dr. Skye's radiology report was part of Plaintiff's CD-Rom submission that was accepted into evidence by the Appeals Council as Exhibit AC-1. If it was not present before the Appeals Council, then it must be evaluated for whether it is new and material evidence requiring remand under Sentence Six of 42 U.S.C. 405(g), which the Court will now do.

New evidence is material at the district court review stage only if there is a reasonable possibility that it would have changed the outcome of the decision.  Hepp v. Astrue,511 F.3d 798, 808 (8th Cir. 2008), Vega v. Commissioner of Social Sec., 265 F.3d 1214, 1218 (11th Cir. 2001), Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989), Falu v. Secretary of Health ahd Human Services, 703 F.2d 24, 27 (1st Cir. 1983).  The report lists among its observations "considerable scoliosis to the right", but does not include scoliosis among its impressions or diagnose it.  In terms of materiality, that notation relates the report to the question whether any objective evidence supports Plaintiff's claim that scoliosis is a medically determinable impairment.  [T. 137].  However, other more timely evidence specifically addressing the possibility of a diagnosis of scoliosis rejects such a diagnosis. [T. 5, 171, 192].  The report's remote date (six years before the date of onset), its silence on the issue of disabling limitations from scoliosis, and its relative weight compared to more timely objective

evidence indicate that it would not have changed the ALJ's decision. Thus, the report creates no basis for remand.[1]

_____

[1]      If Dr. Skye's report had been part of Plaintiff's submission to the Appeals Council, this Court could review it as part of the whole record. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, n. 4 (4th Cir. 1991). It does seem possible that the report was before the Appeals Council, as it is the only means by which the Council as lay persons could have used the information presented in the radiographic images. As such, it would have been the best justification for the Council's decision to accept, rather than reject, Exhibit AC-1 as additional evidence. [T. 4].

Reviewing the report as part of the record below leads to the same result for Plaintiff as reviewing it under the new and material evidence rule: no error is found, and the ALJ's decision is affirmed. Plaintiff offers the report under an apparent, incorrect belief that Dr. Skye's sideline notation about "considerable scoliosis to the right", in the descriptive section of his chest xray report, constitutes a diagnosis thereof. It could have been used by a physician to diagnose scoliosis, but never was, and it is not in and of itself a diagnosis. [Doc. 16-20]. (This is not an adoption of Defendant's argument about image quality [Doc. 12-10]; the notation referenced impugns the quality of paper printouts of the xray, not the diagnostic value of the xray itself.) That report did not indicate that any additional pain or other limitations existed beyond that which the ALJ did hear about in testimony and read about in records. Thus, its value to the Appeals Council in establishing a medically determinable impairment or a significant work impairment at step two was minimal. As such, substantial evidence supported the Council's decision not to grant review.

Though the ALJ did not have Dr. Skye's 2001 xray report to consider at step four, the Appeals Council's determination that it offered no reason to grant review was also supported by substantial evidence. That 2001 xray was not ordered to evaluate any symptom of or limitation from scoliosis, but rather it evaluated for pneumonia. There is no record of treatment for 13 months after that xray, suggesting that Plaintiff experienced no limitations from scoliosis close in time to when it was incidentally displayed on an xray, and the report itself indicates nothing relevant to the step four analysis either at 2001 or during the relevant period, March 31, 2007 through the date of hearing.

Defendant notes that Plaintiff's brief can be interpreted as asserting that her carpal tunnel syndrome and the back condition for which she visited a chiropractor should have assessed as severe at step two. The carpal tunnel syndrome was repaired surgically by her own report [Doc. 9-3] and no residuals were noted by Dr. Rehfield [T. 191]. Her failure to mention the chiropractic treatment at the necessary junctures for meeting her burden of proof relieves the ALJ of his burden to develop the record in this regard. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

The Court also notes that obesity and the medical evidence indicating its severity and limitations were properly considered at each step of the sequential evaluation under SSR 02-1p, resulting in a finding that obesity was severe, but did not when considered in combination with diabetes meet or equal a listing. Its minimal limitations were considered in forming Plaintiff's RFC for sedentary work.

The ALJ's findings in these regards were supported by substantial evidence.

**C.     The ALJ's assessment of the sources of medical evidence and of Plaintiff's credibility followed applicable law and were supported by substantial evidence.**

Plaintiff offered testimony at the hearing, and wrote letters stating her case at a few points in the disability determination process. The information provided in those letters and testimony falls into two categories:

subjective descriptions of symptoms and pain, and Plaintiff's attribution of medical diagnoses to those symptoms and pain, as a substitute for the lack of medical records showing such diagnoses.

Plaintiff's testimony is the sole source of evidence that she was ever diagnosed with arthritis, scoliosis and a heart murmur. Each of those is a diagnosis that can only properly be made through objective medical testing. The regulations only allow evidence of such diagnoses to come in through sources which the regulations define as "accepted". SSR 06-03p. "We use medical and other evidence to reach conclusions about an individual's impairment(s) to make a disability determination or decision as described in 20 C.F.R. 404.1512, 404.1513, 416.912 and 416.913." Id. The phrase "medical sources" refers to both "acceptable medical sources" (licensed medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists, podiatrists, and speech-language pathologists) and other health care providers who are not "acceptable medical sources." See 20 C.F.R. 404. 1502 and 416.902; SSR 06-03p at *1. The distinction between "acceptable medical sources" and others is necessary because we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. 20 C.F.R. 404.1513(a) and 416.913(a). Also, only "acceptable medical sources" can give medical opinions. 20 C.F.R. 404.1527(a)(2) and 416.927(a)(2); SSR 06-03p at *2.

Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 C.F.R. 404.1527(d) and 416.927(d); SSR 06-03p at *2.

Plaintiff herself is not one of those "accepted" sources. Thus her assertions that she has arthritis, scoliosis and a heart murmur [T. 190] establish nothing. There is no evidence of those diagnoses from an "accepted" source (one who is actually diagnosing it, not just quoting Plaintiff's claim that those are in her medical history), and in fact three "accepted" sources found that Plaintiff does not have those conditions: normal cervical spine xray not showing arthritis on August 4, 2008 [T. 266]; and "did not appreciate any scoliosis" or spasm and "no murmur appreciated" during Dr. Rehfield's examination. [T. 191-2]. Thus, substantial evidence supported the ALJ's not finding those to be disabling impairments under our regulations.

Social Security Ruling 96-7p requires the ALJ to assess the credibility of Plaintiff's testimony about subjective pain and symptoms. That Ruling stresses, "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental

impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-7p at *1. The ALJ determined that there were impairments, namely obesity and diabetes, that could reasonably be expected to produce the symptoms Plaintiff described. [T. 20].

The Ruling next required him to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p at *1. The ALJ did discuss Plaintiff's statements and their credibility, at two junctures. At step two, he allowed the possibility that her complaints of pain throughout her body provided evidence of arthritis that was otherwise missing in the medical records [T. 18] and noted that her active lifestyle belies her claims about limitations. [T. 16]. At step four, he indicated that while obesity may put pressure on her joints, her statements that she "hurts all the time, in her neck, back, knees and hips" are not credible.

In the context of this case, where Plaintiff has the burden of proof, Plaintiff attempted to offer medical diagnoses that were disputed by the objective medical evidence of record, without any explanation to resolve the conflict. This affects her credibility. While financial motivation alone

cannot provide grounds for a credibility finding, these other factors can be coupled with Plaintiff's consistent references to her financial need throughout her communications with the State Agency, and the ALJ (which references continued before the Appeals Council and in her making contact with this Court seeking expedited review of this matter due to financial need, even after being asked not to) [T. 32, 45, 109, 110, 89, 169, 172, 173, Doc.9-5 & 6], in fashioning a credibility determination. Ramirez v. Barnhart, 292 F.3d 576 (8th Cir., 2002). This is more significant in light of the fact that Plaintiff did not maximize efforts to obtain free or reduced price medical assistance [T. 278] or fully comply with medical advice [T. 286-8]. "In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief...." McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D.Kan. 1999)(citing Hargis v. Sullivan, 945 F.Supp. 1482, 1490 (10th Cir. 1991)). The ALJ's credibility determination followed applicable law and was supported by substantial evidence.

Defendant notes that substantial evidence supports the ALJ's findings of fact at each step of the sequential evaluation, specifically, his RFC assessment, his weighing of medical evidence, his assessment that Plaintiff's mental impairment was non-severe and resulted in no functional

limitations, and that Plaintiff can perform her past work as an office worker. Upon review of the record, and seeing no argument from Plaintiff on these points, the Court is persuaded by those arguments.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability from the date of onset to the date of his decision.

### O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 8] is **DENIED**; the Defendant's Motion for Judgment on the Pleadings [Doc. 11] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: June 21, 2010

Martin Reidinger
United States District Judge